UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| ALEXANDER STEVEN KING,<br><br>                Petitioner,<br>    v.<br>TIM GARRETT, *et al.*,<br><br>                Respondents. | Case No. 3:18-cv-00202-MMD-WGC<br><br>ORDER |

**I.   SUMMARY**

Petitioner Alexander Steven King, a Nevada state prisoner, filed a Second Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 56 ("Second Amended Petition")). This matter is before the Court for adjudication on the merits of the Second Amended Petition. The Court denies the Second Amended Petition and denies a Certificate of Appealability ("COA").

**II.   BACKGROUND**

    **A.   Facts Underlying Conviction**

On January 3, 2011, King was committing a residential burglary in Silver Springs, Nevada, when the residents, Stuart Gardner and his girlfriend, returned home unexpectedly. (ECF No. 26-3 at 7.) Gardner's girlfriend caught King in their bedroom. (*Id.*) King shoved Gardner's girlfriend out of the doorway and ran out of the house. (*Id.*) Gardner's girlfriend yelled for Gardner, and Gardner attempted to stop King. (*Id.*) King pulled out a gun and shot Gardner in the chest. (*Id.*)

    **B.   Procedural Background**

The state court entered a judgment of conviction upon a guilty plea of first-degree murder (i.e., felony murder) with use of a deadly weapon. (ECF No. 22-20.) The state court sentenced King to a maximum term of life in prison with parole eligibility after 20

years, plus a deadly weapon enhancement of a consecutive term of 48-120 months. (*Id.*) The Nevada Court of Appeals affirmed the judgment of conviction. (ECF No. 22-25.)

King filed a *pro se* state petition seeking postconviction relief. (ECF No. 22-27.) Following an evidentiary hearing, the state court denied the state petition. (ECF Nos. 23-1, 23-2.) The Nevada Court of Appeals affirmed the state court's denial of relief. (ECF No. 23-7.)

King initiated this federal habeas proceeding *pro se.* (ECF No. 1.) Following appointment of counsel, King filed his first amended petition, alleging three grounds for relief. (ECF Nos. 7, 20.) The Court granted Respondents' motion to dismiss in part finding Grounds 1(A) and 2 exhausted and finding Grounds 1(C) and 3 unexhausted. (ECF No. 46.) The Court granted King's motion for stay and abeyance to return to state court and exhaust his unexhausted claims. (ECF No. 49.)

In August 2020, King filed his second state petition seeking postconviction relief. (ECF No. 57-1.) The state court denied the petition on procedural grounds as successive and untimely. (ECF No. 57-2.) The Nevada Supreme Court affirmed on appeal. (ECF No. 57-4.) In June 2022, the Court reopened this federal habeas proceeding, and King filed his Second Amended Petition. (ECF No. 56.) The Court granted Respondents' motion to dismiss in part. (ECF No. 72.)

### III. LEGAL STANDARD

#### A. Review Under the Antiterrorism and Effective Death Penalty Act

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act (AEDPA):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

2

28 U.S.C. § 2254(d). A state court decision is contrary to established Supreme Court precedent, within the meaning of § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of established Supreme Court precedent under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (internal citation omitted) (quoting *Williams*, 529 U.S. at 409-10).

The Supreme Court has instructed that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Court has stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted) (describing the standard as "difficult to meet" and "highly deferential standard for evaluating state court rulings, which demands that state court decisions be given the benefit of the doubt").

### B. Standard For Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring Petitioner to demonstrate that: (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced Petitioner

such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). Courts considering an ineffective assistance of counsel claim must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. It is Petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for Petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104-05. In *Richter*, the Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *See id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Court further clarified that, "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

IV. **DISCUSSION**

### A. Ground 1—Ineffective Assistance of Counsel Re: Mitigation at Sentencing

In Ground 1(A), King alleges that trial counsel rendered ineffective assistance for failure to present mitigation evidence, such as medical records and testimony from a clinical psychologist, at sentencing. (ECF No. 56 at 10-14.) King submits health records, including records from West Hills Hospital and Northern Nevada Adult Mental Health

Services ("NNAMHS"). (ECF Nos. 26-1, 26-2.) Respondents object to the consideration of such health records and evaluations, arguing they are not included in the state court record. (ECF No. 73 at 9.) King asserts that, while postconviction counsel did not attach the records to King's supplemental state habeas petition, counsel set out all pertinent information contained in the West Hills Hospital and NNAMHS records in King's opening brief on appeal. (ECF No. 23-4 at 15-16.) He further contends that the Lake's Crossing Center competency report is part of the state court record, as it was prepared following a motion by King's counsel. (ECF No. 26-3.)

## I.  Consideration of Medical Records

The Supreme Court decided in *Shinn v. Ramirez*, 596 U.S. 366 (2022) that "a federal court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state court record based on ineffective assistance of postconviction counsel" unless the exceptions set forth in 28 U.S.C. § 2254 are satisfied. The requirements of § 2254 are as follows:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
>     (A) the claim relies on-
>
>         (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
>         (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
>     (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A); *see also Shinn*, 596 U.S. at 283 (affirming the prerequisites in § 2254(e)(2) apply only "when a prisoner 'has failed to develop the factual basis of claim'") The Supreme Court has held that, although § 2254(e)(2) refers only to evidentiary hearings, its provisions apply to a federal habeas court's consideration of evidence. *See*

*McLaughlin v. Oliver*, 95 F.4th 1239, 1248-49 (9th Cir. 2024) (acknowledging *Shinn* "reaffirmed that [§ 2254(e)(2)]'s restrictions not only apply to evidentiary hearings, but also apply 'when a prisoner seeks relief based on new evidence *without* an evidentiary hearing'") (citing 596 U.S. at 389).

King does not allege that he can meet the requirements of § 2254(e)(2) but, rather, that the Court can nonetheless consider the medical records because it was "spelled out" in appellate briefs and "incorporated by reference." (ECF No. 83 at 12.) The Court declines to deem the West Hills Hospital and NNAMHS records as part of the state court record to the extent they were "incorporated by reference." The Court, however, will consider the information as recited in King's appellate brief because it was part of the state court record when the Nevada Court of Appeals rejected this claim during the state postconviction proceeding.

## II. Additional Background

### 1. Sentencing Hearing

Before his withdrawal as King's counsel in June 2013, Wayne Pederson obtained medical records detailing King's mental health history, including admission records from West Hills Hospital and NNAMHS as well as a psychiatric evaluation conducted by Lake's Crossing Center. (ECF No. 26-1, 26-3.) Pederson also retained the services of clinical psychologist, Alfredo M. Amezaga, who conducted a two-hour psychological evaluation of King. (ECF No. 21-44.)

Kenneth Ward was appointed to represent King after he entered his guilty plea. (ECF No. 23-1 at 42.) During the sentencing hearing, Ward argued:

> As the Court can see and I think everyone in this courtroom can see his remorse and his apologetic attitude, not just now, but it's been that way for a long time. And he's been having to face the consequences of his own actions for that time as well. He's had a rough time, and I think the fact of his physical and mental disability that he -- made him an easy target. Got all involved in basically a burglary ring where they took him under his wing, treated him like he was good, like he could be their main worker, and they took advantage of him.

(ECF No. 22-19 at 38.)

Ward presented the testimony of King's adoptive parents, Kathryn and Keith King. (*Id.* at 25-31.) Kathryn testified that she adopted King when he was 18 months old after King's biological mother deserted him, leaving him in a house alone for a week, and that King's biological mother committed suicide. (*Id.* at 25-26.) She referred to Gardner's death as a "horrible, horrible accident" that "wouldn't have happened if the State hadn't dropped the ball on [King's] medication, because he was bipolar." (*Id.* at 27.) She provided that King "was running for his life" that day because he wasn't on his medication. (*Id.*)

Keith testified that he came into King's life when he was nine years old and adopted King when he was eleven years old. (*Id.* at 28.) He further testified that King was a "bright" and "very hard-working young man" until the Pluffs[1] became involved in his life. (*Id.*) In addition, Keith commented on King's bipolar disorder:

> His mother is right, he was supposed to be medicated by the State. They dropped the ball. His bipolar disorder did create a situation that allowed the Pluffs to influence him. They caught him at a manic moment and convinced him to do this. He made some terrible bad choices. He was carrying a gun, he should have never been carrying. He went into a man's house. He was raised to know better than to do those kinds of things.

(*Id.* at 29.) Ward questioned Keith regarding King's physical and mental health history:

> **Q:** [King] has had some rather serious mental as well as physical issues going on, correct?
>
> **A:** He's had some corrective surgery. [King] was born looking this way because his mother, his biological mother, was an addict.
>
> What he has is called Goldenhar Syndrome. It creates some mental instability as well as the physical things that you have to see; the missing ear, the misshapen jaw. We've had some surgery done to try to help alleviate that. The goal was at some time to actually have an ear made from cartilage in his rib cage so he would look a little more normal.
>
> Mentally, he was pretty good most of the time until he hit puberty. And, like I said, and then the bipolar disorder kicked in. And, like I said, the Pluffs stepped right in and harvested him.
>
> **Q:** So you believe that because of his basically, his mental health as well as his physical health that the Pluffs, basically, they were his boss and told him what to do –

---

[1] At his postconviction evidentiary hearing, King provided that he only committed the burglary because an individual named Alan Pluff coerced him. (ECF No. 23-1 at 11, 73.) Pluff was the leader of a Northern Nevada burglary ring. (*Id.* at 11.)

7

> **A:** Oh, they victimized him. They did.
>
> [King] has always wanted to try to please people. Yes, he made a bad choice to even become involved with those people, but I believe that those people acted like vultures and sucking him up and were using him in the way that they did.
>
> I do not believe he would have gone to that house for any reason other than that the Pluffs told him it's something he needed to do for them.

(*Id.* at 30-31.)

King testified that four months prior to the shooting, he was struggling because he was recently released from jail, had an extremely hard time finding work, and was trying to fix marital problems with his wife. (*Id.* at 32.) He asserted that "[his] boss ended up pulling [him] into jobs to help pay for [his] probation, [his] wife's probation, food for [his] family, and life quickly started getting further and further out of control." (*Id.* at 32-33.) King's boss instructed him to carry a gun. (*Id.* at 33.) King testified that he was only getting four hours of sleep a night and had difficulty getting medication from the mental health clinic. (*Id.*) King expressed his remorse to the victim's family and his own family. (*Id.* at 35-36.)

Following King's testimony, Ward highlighted King's remorse by providing an apology letter that King wrote to the victim's family two years earlier. (*Id.* at 36.) Ward argued that King has demonstrated his remorse and apologetic attitude for a long time. (*Id.* at 38.) He further argued that based on King's "physical and mental issues …, any time in prison is not going to be gentle." (*Id.* at 39.) Ward asked the state district court to impose the lowest threshold of a 20-to-50-year sentence and to consider a 1-to-20-year deadly weapons enhancement. (*Id.* at 40.)

The state district court imposed a sentence of life with the possibility of parole after 20 years plus a deadly weapon enhancement of a consecutive term of 48-120 months. The state district court provided its reasoning for King's sentencing:

> On the weapons enhancement, the Court has taken into consideration all of the facts and circumstances of the crime. In this case it certainly was an absolutely senseless waste of another human life and absolutely beyond the pale in terms of explaining how it could have happened.

> Certainly, in terms of criminal history, you have a criminal history. The impact of the crime on the other victims certainly you can't have much more of an impact than that of a loved one.
>
> Certainly, there are some mitigating circumstances, one is your relatively young age.
>
> Certainly, the Court doesn't argue with the fact that your life was less than ideal, but perhaps the thing that impacted the Court the most in terms of giving you the possibility of parole in this case is that the Court believes that you truly are sorry for what happened. And there was a letter that was attached to the presentence investigation that you wrote.
>
> And, certainly, the Court believes in redemption. There are people who have done very bad things in their lives who go on to be very significant contributors because they spend the rest of their life paying for the mistakes that they made.
>
> I can only hope that the possibility of parole will give you that ability to work yourself and to pay back.

(*Id.* at 41-42.)

### 2. Postconviction Proceedings

At the postconviction evidentiary hearing, Ward testified that the Lake Crossing mental health evaluation did not contain information that was particularly helpful. (ECF No. 23-1 at 45.) He testified that he made a professional decision not to put on any psychiatric evidence because he determined there would be little benefit. (*Id.* at 55.) Ward decided to focus on King's letters expressing remorse to humanize him more. (*Id.*)

In King's supplemental state habeas petition, in support of his argument that Ward rendered ineffective assistance for failure to call Dr. Amezaga, King asserts:

> Dr. Amezaga would have testified about the cruel hand that Mr. King was dealt even before his birth by a drug consuming mother. His biological mother committed suicide. She left him with birth defects and mental scars. His biological father has not been part of his life, and he suffers from abandonment issues. Mr. King has three suicide attempts prior to this incident. Mr. King has a history of admission to West Hills and NNAMHS.

(ECF No. 26-4 at 16.)

In King's opening brief to the Nevada Court of Appeals, he recites the information in his medical records at length:

> There were two psychiatric evaluations completed upon Mr. King. The first by Lindell Bradley, M.D., explained that Mr. King had suffered two hospitalizations at West Hills Hospital and one hospitalization at Northern

9

> Nevada Adult Mental Health Services. Mr. King suffered from at least three suicide attempts. Mr. King had a history of cutting himself. He has been prescribed psychotropic medications including Lexapro, Celexa, Trazodone, Effexor, Seroquel and Abilify. Mr. King's biological mother. Committed suicide. Mr. King did not have any contact with his biological father until he was 17. Mr. King was raised by his adoptive mother, Mrs. King.
>
> The second psychiatric evaluation was completed by Amy E. Patterson, Ph.D. In that evaluation it was pointed out that Mr. King was born with Goldenhar Syndrome, which is a congenital defect typically characterized by incomplete development of one side of the head and/or face. Mr. King had two surgeries to reconstruct his jaw. His deformities caused him to be teased frequently as a child. By sixth grade, he was suffering problems, getting in to fights and his adoptive mother decided that Mr. King should be home schooled. Mr. King was a good student and received his high school diploma at age 16. Mr. King attended college through the University o[f] Phoenix in business management. He worked at a grocery store, fast food restaurants and at an airport. His biological mother committed suicide when he was 23 months old.

(ECF No. 23-4 at 15-16.)

### 3. State Court Determination

The Nevada Court of Appeals held:

> King argues the district court erred by denying his claim defense counsel was ineffective at sentencing for failing to object to improper victim impact evidence and for failing to present mitigating evidence. . . . [D]efense counsel made a strategic decision as to what mitigating evidence to present and fully argued King's mental and social history to the sentencing court. The record supports the district court's findings and we conclude King was not deprived of effective assistance of counsel in this regard.

(ECF No. 23-7 at 3-4.)

### III. Analysis

In evaluating a claim of ineffective assistance of counsel on federal habeas, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 785. Additionally, "[f]ederal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 788.

Given the deference with which the Court must view counsel's decisions at sentencing, the Court concludes the Nevada appellate court's ruling was neither contrary

10

1  to nor an objectively unreasonable application of clearly established law as determined
2  by the United States Supreme Court. As the Nevada Court of Appeals noted, trial counsel
3  made strategic decisions regarding mitigation at sentencing. *Strickland,* 466 U.S. at 690
4  ("Strategic choices made after thorough investigation of the law and facts are virtually
5  unchallengeable; and strategic choices made after less than complete investigation are
6  reasonable precisely to the extent that reasonable professional judgments support the
7  limitations on investigation.")

8  This is not a case in which counsel failed to present any mental health mitigation
9  at sentencing. Instead, King asserts that Ward did not fully present King's mental and
10 social history, as Ward only called King's adoptive parents to testify—their testimony
11 included passing references to King being bipolar, taking medication, and suffering from
12 Goldenhar Syndrome, but did not include King's abuse and harassment at school,
13 substance abuse, depression, or various suicide attempts or psychiatric issues beyond
14 his bipolar disorder.

15 It is clear that "evidence about the defendant's background and character is
16 relevant because of the belief, long held by this society, that defendants who commit
17 criminal acts that are attributable to a disadvantaged background, or to emotional and
18 mental problems, may be less culpable than defendants who have no such excuse."
19 *Boyde v. Cal.,* 494 U.S. 370, 380 (1990). Counsel presented mitigating evidence about
20 King's traumatic childhood, that King was bipolar and off his medication, that King was
21 influenced by an individual during a manic period and while he was struggling after a
22 recent release from jail, and that King was extremely remorseful. The presentence
23 investigation report also reviewed King's childhood and mental health history, including
24 his depression diagnosis, suicide attempts, and substance abuse history. (ECF No. 26-3
25 at 3-4.)

26 The Court finds that the Nevada appellate court's determination regarding the
27 scope of counsel's mitigation presentation was reasonable even though counsel did not
28 necessarily present the full scope of King's mental health and social history with expert

11

testimony. Although Ward did not argue King's mental health and social history in significant detail, particularly his history of depression, suicide attempts, and substance abuse history, an examination of the proffered psychiatric evaluations in the state court record and the information contained in those statements reveals that the mental health and social history was not appreciably different from the evidence that was introduced during the penalty phase proceedings. *See Wong v. Belmontes,* 558 U.S. 15, 22-23 (trial counsel is not required to present cumulative mitigating evidence). Counsel chose to emphasize other mitigation factors highlighting that "everyone in this courtroom can see his remorse and his apologetic attitude, not just now, but it's been that way for a long time." (ECF No. 22-19 at 38.) In fact, the state district court provided in its sentencing rationale that "the thing that impacted [the state district court] the most in terms of giving [King] the possibility of parole" was that King demonstrated that he was "truly are sorry for what happened." (ECF No. 22-19 at 41-42.)

Even if the facts alleged were sufficient to state a case of deficient performance, King must also demonstrate that counsel's deficient performance was prejudicial and that the Nevada appellate court's rejection of this claim was an objectively unreasonable application of *Strickland*. As discussed below, the Court would reach the same result on the prejudice prong of *Strickland* even on *de novo* review.

Even on *de novo* review, in the alternative, the Court nonetheless finds that King fails to demonstrate a reasonable probability that the results of the penalty phase would have been different if counsel presented the omitted mitigation evidence. Given the aggravating evidence and the circumstances of the crime, King fails to establish a reasonable probability that the proffered mitigation evidence would have led to a different penalty phase outcome. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("In assessing prejudice, [this Court] reweigh[s] the evidence in aggravation against the totality of the available mitigating evidence."); *see also Wong*, 558 U.S. at 27-28 ("It is hard to imagine expert testimony and additional facts about Belmontes' difficult childhood outweighing the facts of [the] murder.").

King had prior felony convictions. (ECF No. 26-3 at 5-6.) After the residents of the home interrupted King's burglary, King fled and indiscriminately fired behind him. The state district court described the circumstances of the crime as "an absolutely senseless waste of another human life and absolutely beyond the pale in terms of explaining how it could have happened." (ECF No. 22-19 at 41.) The state presented testimony from the victim's family regarding the impact of his death.

The Court acknowledges that the omitted evidence further humanizes King. However, "even if this evidence had been presented to the jury, it would not have significantly altered the character of the evidence supporting mitigation." *Berryman v. Wong*, 954 F.3d 1222, 1228 (9th Cir. 2020). "Reasonable jurists could therefore conclude that admission of this evidence would not have led to a reasonable probability of a different sentence." *Id.* (citing *Pinholster*, 563 U.S. at 200-02.) As the state district court observed, King's life "was less than ideal," but the most impactful mitigation evidence was King's letter to the victim's family expressing his remorse, which counsel emphasized at sentencing. (ECF No. 22-19 at 42.) The state district court afforded King a chance at "redemption" and sentenced him to 20 years to life and a four-to-ten-year enhancement. (*Id.*) The Court finds that King fails to demonstrate a reasonable likelihood that the results of the penalty phase would have been different if counsel presented further mitigation evidence of King's mental health or social history. Accordingly, the Court denies King federal habeas relief on Ground 1(A).

### B. Ground 2—Validity Of Guilty Plea

In Ground 2, King alleges that his guilty plea was not knowingly, intelligently, or voluntarily entered because his counsel rendered ineffective assistance by giving him incorrect and inadequate advice regarding felony murder defenses. (ECF No. 56 at 23-25.) King asserts that Pederson advised him that King "had nothing to work with." (*Id.* at 24.) Even though Pederson knew that (1) King was committing crimes for Alan Pluff, an older man manipulating others, (2) that Pluff "controlled" King, and (3) that Pluff and his crew were violent people, Pederson did not consider a defense of coercion or duress to

the underlying felony of burglary. (*Id.*) King asserts that counsel did not advise him regarding the defense of duress, or any other defense, even though counsel was aware of facts that would call for such defenses. (ECF No. 83 at 23-24.) King argues that he could have presented a defense at trial that he lacked intent as to his burglary charge because of the duress and coercion inflicted by the Pluffs. (*Id.* at 27.)

### I. Additional Background

#### 1. Guilty Plea Canvas and Memorandum

At the plea canvas, the state district court affirmed that King discussed the facts and circumstances of the crime as well as the potential penalties. (ECF No. 21-40 at 4.) King affirmed that he read, understood, and signed the guilty plea agreement. (*Id.* at 6.) The state district court instructed King to tell the court what happened to cause the charge to be filed against him. (*Id.* at 9.) King responded:

> I was committing a burglary, and I did not get a phone call from my partners letting me know that anybody came out to the house. And as I ran away, I shot a pistol behind my back to scare away the person that was chasing me. And I accidentally shot him in the chest.

(*Id.* at 10.)

In the guilty plea memorandum, King affirmed that he discussed the elements of the original charge against him with his attorney and that he understood the nature of the charge against him. (ECF No. 21-41 at 5.) He affirmed that he discussed any possible defenses, defense strategies, and circumstances that may be in his favor with his attorney. (*Id.*) He further affirmed that "all of the foregoing elements, consequences, rights, and waiver of rights have been thoroughly explained to me by my attorney." (*Id.*) Attached to the guilty plea memorandum is a certificate of King's counsel, in which counsel stated that he fully explained to King the allegations contained in the charge to which the guilty plea is being entered. (*Id.* at 6-7.)

#### 2. Postconviction Evidentiary Hearing

Pederson testified as to his representation of King during the plea process. (ECF No. 23-1 at 5-40.) When asked if Pederson discussed possible defenses with King, he responded:

> Well, or the lack thereof in this case. Since his – I mean, Mr. King is an intelligent person, and in that respect, he wrote – and that's what he did, he liked to write. So he wrote a letter to the court admitting to the burglary. He wrote a letter to me. He wrote a letter to the family, all confessing to the burglary, which in my – you know, my legal, you know, advice to him was since it was a death that was committed in commission of a burglary that there was not much of a defense to it.

(*Id.* at 10.) He further testified that he did not see the ability to defend the burglary and that King did not want to defend that part because King "was always very, very clear and open that he had committed that burglary." (*Id.*)

As to his knowledge of King's relationship with the Pluffs, Pederson testified that King married the daughter in the family, that King was "sort of one of the pack," and that King was "sort of controlled" by Pluff. (*Id.* at 11.) Pederson knew that King "didn't want to cross [Pluff], but "it didn't seem to me like [King] was concerned about getting harmed before." (*Id.* at 12.) King was concerned about being harmed after because he didn't want to implicate the Pluffs in court. (*Id.*) Pederson was sure that "fear might have played a part." (*Id.*)

Pederson testified that he did not consider the defense of coercion because King was at the home by himself, and there were many times that King could have called for help if he thought he was being coerced. (*Id.* at 11-12.) He advised King that he believed King "had no chance at trial" and that if he went to trial, he believed King would receive a sentence of life without parole. (*Id.* at 16.)

King testified at the postconviction evidentiary hearing that the only discussion of any possible defenses he had with Pederson was that King had no defense. (*Id.* at 72.) King explained to Pederson that he committed the burglary because he was being manipulated. (*Id.*) He testified that he was coerced into committing the burglary, that Pluff drove him to the residence and dropped him off, and that Pluff told him what to do. (*Id.* at 73.) King was afraid if he did not commit the burglary that he would be harmed and that "there was always a threat of violence in the house." (*Id.*)

King testified that he did not intend to shoot the victim but shot to scare them away. (*Id.* at 74.) He pulled the gun out of the holster with his right hand, pulled back the slide

to load the gun, and swung his arm around behind his back while still running forward and pulled the trigger once. (*Id.* at 75.) He testified that he never looked back. (*Id.*)

On cross-examination, King was questioned about physical threats of violence if he did not commit the burglaries:

> **Q:** And what were the physical threats? You said there was some manipulation but describe with specificity the physical threats.
>
> **A:** I lived in a house full of guns.
>
> **Q:** Okay.
>
> **A:** I lived in a house with a man who claimed to commit murder. There was always threats. If you didn't obey there was always the threat of violence. If you went against someone there was a thought that you were thinking about crossing him. I seen it happen.

(*Id.* at 85.)

### 3. State Court Determinations

In affirming King's conviction on direct appeal, the Nevada Court of Appeals rejected claims similar to Ground (2), explaining:

> Appellant argues that his plea is invalid because the district court and trial counsel failed to advise him that if he went to trial he could possibly be convicted of a lesser included offense or that felony murder could be negated by arguing lack of intent for the underlying felony. …
>
> The district court conducted an evidentiary hearing and found that appellant entered into his plea voluntarily, knowingly, and intelligently. The district court found that appellant was incorrect that he could have been found guilty at trial of lesser-included offenses because appellant was charged with first-degree felony murder. *See Graham v. State*, 116 Nev. 23, 28-29 (2000) (concluding that when a person is charged with an enumerated first-degree murder pursuant to NRS 200.030(1), the charge cannot be reduced by failure to prove deliberation, premeditation, or intent). Therefore, counsel was not ineffective for failing to inform him of lesser-included offenses because there were no lesser-included offenses possible. Further, the district court concluded that appellant failed to support his claim regarding a defense to the underlying burglary with any evidence and it amounted to a purely speculative claim.
>
> The record on appeal supports the district court's factual findings and we conclude that appellant has not demonstrated that counsel was ineffective; established a substantial, fair, and just reason for withdrawing his plea; or shown that the district court abused its discretion by denying his motion to withdraw his guilty plea.

(ECF No. 22-25 at 2-4.)

On appeal of the denial of King's state postconviction habeas petition, the Nevada Court of Appeals held:

> King argues the district court erred in denying his claim defense counsel was ineffective for failing to investigate and advise him on the defenses of coercion and accident. The district court conducted an evidentiary hearing and made the following findings: Defense counsel discussed the case in depth with King and informed him he did not have a defense. King's testimony that he was forced to commit the burglary was speculative, he failed to point out any specific fact that would have supported a defense of coercion, and it was highly unlikely a jury would have concluded he was forced to commit the underlying felony and consequently was not guilty of felony murder. King's testimony he knew he was being chased by the victim, removed a handgun from his holster, loaded a round into the chamber of the handgun, and shot the handgun in the direction of the victim was in stark contrast with the eyewitness statement that King turned and faced the victim, lifted the handgun, and shot the victim in the chest. And King failed to demonstrate his testimony would have changed the outcome in the case. The record supports the district court's findings. and we conclude King was not deprived of effective assistance of counsel in this regard.

(ECF No. 23-7 at 4.) (citations omitted)

**C. Analysis**

The federal constitutional guarantee of due process requires that a guilty plea be knowing, intelligent, and voluntary. *See Boykin v. Ala.*, 395 U.S. 238, 242 (1969). "The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *N.C. v. Alford*, 400 U.S. 25, 31 (1970)). The relevant inquiry is whether a petitioner's guilty plea was voluntary and intelligent under the totality of the circumstances. *See Alford*, 400 U.S. at 31; *Brady*, 397 U.S. at 749.

If "a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). The Supreme Court has held "that the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Id.* at 58. The deficient performance prong remains the same. *Id.* at 58-59. But the prejudice prong

"focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* at 59. Thus, "to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

The Nevada Court of Appeals' ruling was neither contrary to nor an objectively unreasonable application of clearly established law as determined by the United States Supreme Court.

Although King's postconviction evidentiary testimony provides some support for the defense of coercion, his counsel did not unreasonably advise King after thoroughly discussing the case with King. Pederson testified at the postconviction evidentiary hearing that King seemed more concerned about being harmed after the burglary because he didn't want to implicate the Pluffs in court. (ECF No. 23-1 at 12.) Although it is possible that a factfinder could have considered that King was influenced or manipulated into committing the burglary, the relevant inquiry is not what defense counsel could have done, but, rather, whether the choices he made were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). As the Nevada appellate court noted, there was an eyewitness statement that King "turned and faced the victim, lifted the handgun, and shot the victim in the chest," as opposed to King's assertion that he shot the gun in the direction of the victim while being chased. (ECF No. 23-7 at 4.) In light of the evidence against King and given that he could have received a sentence of life without parole, it cannot be said that counsel's advice fell below an objective standard of reasonableness under prevailing professional norms. *See Strickland*, 466 U.S. at 688.

To demonstrate prejudice as a result of counsel's failure to advise him of a potential defense, King must show that the defense would have succeeded at trial. *See Hill*, 474 U.S. at 59. He has not done so. As the Nevada appellate court found, King "failed to point out any specific fact that would have supported a defense of coercion, and it was highly unlikely a jury would have concluded he was forced to commit the underlying felony and consequently was not guilty of felony murder." (ECF No. 23-7 at 4.) Although King testified

at the postconviction evidentiary hearing that if he "didn't obey there was always the threat of violence" and that he "lived in a house full of guns," the record shows that King was at the home by himself and there were many times that King could have called for help if he thought he was being coerced. (ECF No. 23-1 at 11-12.) *See Padilla v. Ky.*, 599 U.S. 356, 372 (2010) ("[P]etitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.") Accordingly, the Court denies King federal habeas relief for Ground 2.

## V.     CERTIFICATE OF APPEALABILITY

This is a final order adverse to King. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a COA. The Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *see also Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the Court's procedural ruling was correct. *Id.*

Applying these standards, the Court finds that a certificate of appealability is unwarranted.

///
///
///
///
///
///

## VI. CONCLUSION

It is therefore ordered that Petitioner Alexander Steven King's Second Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 56) is denied.

It is further ordered that a certificate of appealability is denied.

It is furthered ordered that the Court directs the Clerk of Court to enter judgment and close this case.

DATED THIS 23rd Day of September 2025.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE